UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 24-536 JGB (SHKx)** | Date | May 11, 2026 |
|---|---|---|---|
| Title | *Fabriciano Diaz Salgado, et al. v. United States of America, et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    FINDINGS OF FACT AND CONCLUSIONS OF LAW (IN CHAMBERS)**

Plaintiffs Fabriciano Diaz Salgado and Esther Salgado Adame (collectively, "Plaintiffs") brought this action against defendant United States of America ("Defendant" or the "United States") and Does 1 through 10 alleging two causes of action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346 and 2671-80, stemming from a motor vehicle collision with a United States Postal Service ("USPS") vehicle operated by Ashley Owens: (1) negligence and (2) negligence per se.  (Id.)

The case was tried before the Court without a jury on August 5, 6, and 11, 2025.  The Court ordered the parties to submit proposed findings and conclusions of law by October 14, 2025.  Plaintiffs filed their proposed findings and conclusions of law on October 14, 2025. (Dkt. No. 68.)  Defendant also filed its proposed findings and conclusions of law on October 14, 2025. (Dkt. No. 69.)

The Court, having considered all the evidence presented by the parties, the written submissions from both sides, and the argument of counsel, issues the following Findings of Fact and Conclusions of Law.

//
//
//
//
//

## I.    FINDINGS OF FACT

On October 8, 2021, at approximately 4:34 p.m., Mr. Diaz Salgado was operating a 2017 Nissan Sentra northbound on Troth Street in Jurupa Valley, California.  Ms. Salgado Adame was a passenger in the front seat of the 2017 Nissan Sentra at the time of the collision.  The intersection of 50th Street and Troth Street is controlled by a stop sign on eastbound 50th Street.  Troth Street (northbound/southbound direction) did not have a stop sign or other traffic control devices at this intersection and had the right-of-way at that intersection.  At the time of the collision, Ms. Ashley Owens, a USPS employee then on duty, was operating a USPS Jeep LLV eastbound on 50th Street at the intersection of Troth Street.

Ms. Owens approached the stop sign at eastbound 50th Street and was required by law to come to a complete stop and yield the right-of-way to traffic on Troth Street.  Ms. Owens had driven this route at least 300 times before this collision and knew there would be a stop sign and knew she needed to look for traffic before proceeding.  Ms. Owens failed to yield the right-of-way to Mr. Diaz Salgado's vehicle, which was traveling northbound on Troth Street and had the right-of-way.  The USPS vehicle entered the intersection directly in front of Plaintiffs' vehicle.  Mr. Diaz Salgado and Ms. Salgado Adame witnessed the USPS mail truck fail to stop at the stop sign.  Mr. Diaz Salgado tried to brake, but his vehicle struck the USPS vehicle in a T-bone collision, causing Mr. Diaz Salgado's airbags to deploy.  Mr. Diaz Salgado was driving normally like he would do any other day as he drove on Troth Street.

Ms. Owens stated that she looked both ways before entering the intersection but claimed she did not see Plaintiffs' vehicle until just a split-second before impact.  Ms. Owens had a clear view down Troth Street while she was stopped at the stop sign before proceeding into the intersection.  Ms. Owens did not continue to look for traffic as she crossed through the intersection.  The Riverside County Sheriff's Office Traffic Collision Report authored by Officer K. Shinn identified Ms. Owens as the primary collision factor for failing to yield at a stop sign in violation of Cal. Veh. Code § 21802(a).  The USPS's industrial accident report indicated Ms. Owens pulled from a stop sign and struck a non-postal vehicle with the right-of-way, and that USPS determined the primary cause was inattention or distraction.  Mr. Diaz Salgado's Nissan Sentra sustained major damage and was a total loss in the collision.

The Court finds Ms. Owens's testimony that she "looked both ways and saw no vehicles" before crossing the intersection not credible.  The evidence establishes that Plaintiffs' vehicle was visible to an attentive driver.  The Court credits the testimony of Fabriciano Diaz Salgado and Esther Salgado Adame as truthful and consistent with the evidence and the investigating officer's report.  Defendant's accident reconstruction expert Todd Roescher, whose evaluation is discussed in further detail below, did not evaluate this case from the perspective of Ms. Owens, he evaluated it only from the perspective of Mr. Diaz Salgado.  Based on Mr. Roescher's analysis, Ms. Owens started pulling into the intersection when Plaintiffs' vehicle was only 2.5 seconds away at 150 feet.  Mr. Roescher had no explanation as to why Ms. Owens could not see Plaintiff's vehicle at 2.5 seconds/150 feet away, 2 seconds/120 feet away, 1.5 seconds/100 feet away, or 1

second away.  Mr. Roescher confirmed that it is typical driver behavior for a driver that has a stop sign before her to maneuver into a position where the driver can see before crossing

On the day of the accident, Diaz Salgado told Riverside County Sheriff Deputy Kenneth Shinn that he was "going the speed limit" and, when Deputy Shinn asked Diaz Salgado what the speed limit was, Diaz Salgado stated 45 MPH.  At trial, Diaz Salgado claimed that he was "driving normal."

Tedd Roescher is a forensic scientist, who specializes in the fields of accident reconstruction and human factors.  Accident reconstruction is the science concerned with reconstructing motor vehicle accidents, which is principally concerned with the physics of how fast vehicles were traveling, with heading angles, and with brake usage.  Human factors is the science of how people interact with their environment.  Within the scope of motor vehicle accidents, it studies how people behave when they are behind the wheel of a vehicle.  Roescher has a Bachelor of Science degree in biomechanical engineering with a concentration in biomechanics and human performance from Drexel University, and a Master of Science degree from California State University, Long Beach, in human factors.  Roescher is an accredited traffic accident reconstructionist through ACTAR (Accreditation Commission for Traffic Accident Reconstruction).  To arrive at his opinions, Roescher reviewed scientific literature, conducted his own independent tests, and reviewed case materials.

Roescher created computer simulations to determine the rest positions of Diaz Salgado's vehicle and the USPS Jeep LLV after the accident.  Those computer simulations determined that, *at the moment of impact*, the USPS Jeep LLV was traveling at about 8.6 miles per hour and Diaz Salgado's vehicle was traveling about 24.8 miles per hour.  Roescher determined that, if Diaz Salgado's vehicle was traveling between 22 and 27 miles per hour at time of impact, the simulation produced reasonable results.  Roescher determined that, if the USPS Jeep LLV was traveling between 8 and 10 miles per hour at time of impact, the simulation produced reasonable results.  Roescher considered whether Diaz Salgado's vehicle could have been traveling the speed limit of 25 miles per hour *before the impact*.  Roescher ran a simulation under the assumption that Diaz Salgado's vehicle was traveling the speed limit of 25 miles per hour before the impact. Based on that simulation, Diaz Salgado would have been able to stop in time to avoid the accident.  The USPS LLV only needed 0.8 seconds to cross the intersection, or to at least get out of the path of Diaz Salgado's vehicle.  Roescher concluded that, regarding the impact speeds of the involved vehicles, the USPS LLV was traveling between 8 and 10 miles per hour, and Diaz Salgado's vehicle was traveling between 22 and 27 miles per hour.  Roescher concluded that it is more probable that Diaz Salgado was traveling 45 miles per hour *before the impact*, rather than the posted speed limit of 25 miles per hour.  Roescher's conclusion is consistent with Diaz Salgado's statements to Deputy Shinn on the day of the accident that he was driving 45 miles per hour. Roescher's opinions are credible and convincing

Following the collision, Mr. Diaz Salgado experienced head pain and headaches, neck pain, mid-back pain, low back pain, pain in both lower extremities/legs, pain in his chest, and pain in the right upper extremity/right shoulder, nausea, vomiting, dizziness, light sensitivity and

blurred vision.  Mr. Diaz Salgado went to the emergency room after the collision.  Mr. Diaz Salgado's pain continued and worsened, but he tried to focus on work and did not have insurance and did not like going to doctors, so he tried to work through the pain and symptoms for the next few months until he saw three of his main doctors, Dr. Pablo Pazmino, Dr. Charles Gruver, and Dr. Rajan Patel.  During additional treatment, Mr. Diaz Salgado continued to have complaints of pain in his low back and neck and radiating pain into his legs and feet and hands and fingers, headaches, and right shoulder pain, and significant functional limitations with sleep, sitting, standing, lifting, driving, grip strength, playing with kids, sexual activity, texting, bending, household chores, and social activities.  Mr. Diaz Salgado had positive findings on examinations to his neck, low back, and right shoulder during his examinations with board-certified spine surgeon Dr. Pablo Pazmino, M.D., board-certified orthopedic shoulder surgeon Dr. Rajan Patel, M.D., and board-certified pain management specialist Dr. Charles Gruver, M.D.  MRI imaging of Mr. Diaz Salgado's right shoulder showed a labral tear, which Dr. Patel confirmed during his arthroscopic surgery of the right shoulder.  MRI imaging of Mr. Diaz Salgado's lumbar spine showed a significant disc protrusion at L5-S1, which is abnormal for someone Mr. Diaz Salgado's age.  Mr. Diaz Salgado was diagnosed with a cervical sprain and strain injury, cervicalgia, a lumbar sprain and strain injury, lumbago, lumbar disc disorder with radiculopathy, pain in the right shoulder, pain in the left shoulder, post-concussion syndrome, a right shoulder labral tear, and disc herniations in his lumbar spine most prominently at L5/S1, L3-4, and L4-5.  Mr. Diaz Salgado went through several treatment modalities and procedures, including physical therapy, epidural injections and nerve root block injections in the lumbar spine, conservative treatment and PRP injection to the right shoulder, surgery to his right shoulder to repair a labral tear, and surgery to his lumbar spine to remove a fragment of his disc protrusion.

Mr. Diaz Salgado had no history of accidents, pain, trauma, or physical limitations before the collision.  Mr. Diaz Salgado incurred $302,753.54 in medical bills for all of his post-collision treatment.  All of Mr. Diaz Salgado's bills for treatment are owed in full.  The symptomology and injuries that were diagnosed to Mr. Diaz Salgado are consistent with acute trauma or mechanical forces such as acceleration, deceleration, or blunt force trauma.  All the treatment provided to Mr. Diaz Salgado was medically necessary and was reasonable and appropriate for the injuries sustained in the crash.  Mr. Diaz Salgado's relationship with his kids, wife, and friends was affected from the collision and his injuries.  Mr. Diaz Salgado still experiences symptoms from the collision, including complaints with his low back and problems sleeping.

Following the collision, Ms. Salgado Adame experienced a feeling of suffocation, shortness of breath, pain in the stomach, neck pain, low back pain, midback pain, right shoulder pain, aching, pinching, tightness, radiating pain into the shoulders, arms, hands, fingers, bottom of her head and the upper back with radiating pain onto both sides, with limitations related to sleeping, standing, bending, carrying, cooking, going up and downstairs, and trouble with household chores.  Ms. Salgado Adame had positive findings on examinations to her neck, low back, and right shoulder during her examinations with board-certified orthopedic surgeon Dr. Rajan Patel, M.D., and board-certified pain management specialist Dr. Charles Gruver, M.D.  MRI imaging of Ms. Salgado Adame's right shoulder revealed a torn rotator cuff, which was confirmed by Dr. Rajan Patel during surgery.  Ms. Salgado Adame was diagnosed with cervical sprain and strain

injury, cervicalgia, cervical disc disorder with radiculopathy, lumbar sprain and strain injury, lumbago, lumbar disc disorder, sprain of the sacroiliac joint, and headaches, and a torn rotator cuff. Ms. Salgado Adame's torn rotator cuff is consistent with trauma. Ms. Salgado Adame went through various procedures following the crash, including bilateral cervical selective nerve root blocks in her neck, lumbar epidural injections and sacral selective nerve root blocks, and right shoulder surgery to repair the torn rotator cuff following conservative treatment.

Ms. Salgado Adame had no history of any symptoms, trauma, or prior accidents or issues with her function before the collision. Ms. Salgado Adame incurred $259,100.00 in medical bills for all of her post-collision treatment. All of Ms. Salgado Adame's bills for treatment were done on a lien and are owed in full. All the treatment provided to Ms. Salgado Adame was medically necessary and was reasonable and appropriate for the injuries sustained in the crash. Ms. Salgado Adame continues to experience symptoms from the collision, including weakness and pain and loss of motion in her right shoulder, including a demonstrated inability to lift her arm above shoulder height, and continued pain in her neck and low back. She also feels panicked and scared to get into a car. She remains unable to lift her arm above shoulder height. Ms. Salgado Adame's relationship with her grandchildren has changed as well as her social activities and ability to work due to her injuries.

Defendant's spine surgeon expert, Dr. Brian Rudin, M.D., never examined Plaintiffs and provides no diagnoses because he would never diagnose a patient of his own without seeing them. Dr. Rudin has no opinions whether Plaintiffs' surgeries were unnecessary or not medically indicated. Dr. Rudin confirmed that all of Plaintiffs' symptoms and complaints started after the collision and that there is no documentation of any injuries, symptoms, or complaints before the collision. Defendant's shoulder surgeon expert, Dr. Jason Snibbe, M.D., never examined Plaintiffs, he only reviewed records of Ms. Salgado Adame. Dr. Snibbe only reviewed records related to Ms. Salgado Adame and did not review any information or have any opinions regarding Mr. Diaz Salgado. Dr. Snibbe has no opinion on whether the shoulder surgery to Ms. Salgado Adame was unnecessary. Both Dr. Rudin and Dr. Snibbe have no opinions on whether Plaintiffs were malingering or being untruthful about any of their injury complaints. Defendant's billing expert Vicki Schweitzer did not speak with any of Plaintiffs' medical providers to determine whether there would be any reduction in any of the outstanding bills and had no information about what specific agreements Plaintiffs had with their providers regarding payment of the bills.

## II.    CONCLUSIONS OF LAW

### A.  Jurisdiction and Applicable Law

This action arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1). Venue is proper in this District because the acts and omissions giving rise to the claims occurred within the Central District of California. The United States is liable for the negligent acts or omissions of its employees acting within the scope of employment to the same extent as a private person under the substantive law of California. See 28 U.S.C. § 2674. In this bench trial,

Plaintiffs bear the burden of proving their case by a preponderance of the evidence—that is, evidence that has more convincing force than opposing evidence. Conservatorship of O.B., 9 Cal.5th 989, 995-996 (2020). Defendant bears the burden of proving its affirmative defenses, including comparative fault and failure to mitigate, by a preponderance of the evidence. Soule v. General Motors Corp., 8 Cal.4th 548, 580 (1994).

### B.  Negligence Under California Law

Under California Civil Code § 1714, every person is responsible for injury occasioned to another by his or her want of ordinary care in the management of property or person. The elements of negligence are: (1) duty, (2) breach of duty, (3) proximate cause, and (4) damages. Peredia v. HR Mobile Servs., Inc., 25 Cal. App. 5th 680, 687 (2018). Under California law with respect to negligence per se, each driver on the roadway is "under a duty, both by statute and common law, to operate his vehicle without negligence so as to abstain from injuring any other person or his property." Drury v. Ryan, 109 Cal. App. 5th 1102, 1108–09 (2025). Negligence is presumed if the plaintiffs establish four elements: (1) the defendant violated a statute; (2) the violation proximately caused injury; (3) the injury resulted from an occurrence the nature of which the statute was designed to prevent; (4) the person suffering injury was one of the classes of persons for whose protection the statute was adopted. Taulbee v. EJ Distribution Corp., 35 Cal.App.5th 590, 596 (2019). California Vehicle Code Section 21802(a) states: "The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop as required by Section 22450. The driver shall then yield the right-of-way to any vehicles which have approached from another highway, or which are approaching so closely as to constitute an immediate hazard, and shall continue to yield the right-of-way to those vehicles until he or she can proceed with reasonable safety."

Ms. Owens owed a duty of care to other motorists, including Plaintiffs, to operate her vehicle in a reasonably safe manner, to obey traffic laws, and to yield the right-of-way. Cal. Veh. Code § 21802(a) required Ms. Owens to stop at the stop sign on eastbound 50th Street and yield the right-of-way to vehicles approaching from Troth Street. Ms. Owens breached her duty of care by failing to yield the right-of-way to Plaintiffs' vehicle in violation of California Vehicle Code Section 21802(a). Ms. Owens failed to use reasonable care to prevent harm to Plaintiffs. Ms. Owens's statutory violation supports a presumption of negligence under the doctrine of negligence per se. Ms. Owens was acting within the course and scope of her employment with the United States Postal Service at the time of the collision, and Ms. Owens's negligence is imputed to the United States under the FTCA because she was acting within the scope of her USPS employment with the Defendant United States of America.

### C.  Causation

A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. Wilson v. Blue Cross of So. Cal., 222 Cal.App.3d 660, 671-672 (1990). Under California law, a plaintiff need not prove causation with absolute certainty. It is

sufficient if the evidence establishes that the defendant's conduct was more likely than not a cause of the plaintiff's injury. <u>Leslie G. v. Perry & Associates</u>, 43 Cal.App.4th 472, 483 (1996). The temporal relationship between the collision and the onset of symptoms, combined with the absence of any prior complaints, supports a finding of causation. <u>See Jones v. Ortho Pharmaceutical Corp.</u> 163 Cal.App.3d 396, 403 (1985). Ms. Owens' negligent failure to yield the right-of-way was a substantial factor in causing Plaintiffs' injuries. The evidence overwhelmingly supports that Plaintiffs' injuries and symptoms arose immediately after the collision. It is undisputed that neither Plaintiff had any injury complaints, symptoms, or functional limitations before the collision, and Defendant presented no evidence of pre-existing conditions.

Ms. Salgado Adame's rotator cuff tear, while potentially associated with aging in some cases, is consistent with acute trauma when it occurs suddenly following impact and is accompanied by immediate pain and functional limitation with no prior history of shoulder problems. The testimony of Plaintiff's treating doctors, Drs. Gruver, Patel, and Pazmino, establish more likely than not that the injuries sustained by Plaintiffs were due to trauma and were not pre-existing.

### D. Economic Damages

To recover damages for past medical expenses, Plaintiffs must prove the reasonable cost of reasonably necessary medical care that they have received. <u>Williams v. The Pep Boys Manny Moe & Jack of California</u>, 27 Cal. App. 5th 225, 237 (2018); <u>Hanif v. Housing Authority of Yolo County</u>, 200 Cal. App. 3d 635, 640 (1988). Plaintiffs treatment in this case was done on a lien. To admit medical bills based on a medical lien at trial, the plaintiff must demonstrate (1) that the medical expenses were actually incurred and that the plaintiff remains liable for their payment, and (2) that the amounts billed represent the reasonable value of the medical services provided. <u>Moore v Mercer</u>, 4 Cal. App. 5th 424, 446-437 (2016). Unpaid medical bills are admissible to prove the reasonable value of past damages, even in the absence of expert testimony. <u>Qaadir v. Figueroa</u>, 67 Cal. App. 5th 790 (2021). The reasonable value of medical services is generally established by the amounts actually charged, unless the defendant presents evidence that the charges were unreasonable. <u>Hanif v. Housing Authority</u>, 200 Cal. App. 3d 635, 640 (1988). The evidence establishes that all treatment provided to Plaintiffs was medically necessary and within the standard of care. Defendant presented no competent evidence that any specific treatment was unnecessary or that the charges were unreasonable.

Mr. Diaz Salgado, through his testimony and the testimony of his treating physicians, has proven that he has incurred reasonable and necessary medical expenses in the amount of $302,753.54 for treatment related to the collision. Ms. Salgado Adame, through her testimony and the testimony of her treating physicians, has proven that she has incurred reasonable and necessary medical expenses in the amount of $259,100.00 for treatment related to the collision. The evidence is undisputed that Plaintiffs incurred these medical bills through treatment on a lien, and that all these bills remain outstanding and are owed to Plaintiffs' medical providers for treatment after the collision. Defendant's billing expert Ms. Schweitzer admitted she had no information regarding what is owed and what contractual agreements Plaintiffs had with their medical providers.

### E.  Non-Economic Damages

Plaintiffs are entitled to recover general damages for past and future physical pain, mental suffering, emotional distress, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress.  Capelouto v. Kaiser Foundation Hospitals, 7 Cal.3d 889, 892-893 (1972); Bigler-Engler v. Breg, Inc., 7 Cal. App. 5th 276, 300 (2017); Phipps v. Copeland Corp. LLC, 64 Cal. App. 5th 319, 337-338 (2021).  Mr. Diaz Salgado has proven that he has suffered past and future noneconomic damages for his physical pain, mental suffering, emotional distress, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress in the amount of $1,195,000.00.  He is awarded $475,000 in past non-economic damages from the time of the collision on October 8, 2021 through trial, and $720,000 in future non-economic damages. A 41-year-old male has a life expectancy of 36.6 years under the California Civil Jury Instructions ("CACI") life expectancy tables based on the National Vital Statistics Reports.  This represents approximately $340/day for the past award when the complaints were more significant, and $55/day for the future given the significant effect on Mr. Diaz Salgado's work life, marriage, and ability to play with and enjoy time with his children.  Ms. Salgado Adame has proven that she has suffered past and future non-economic damages for her physical pain, mental suffering, emotional distress, loss of enjoyment of life, disfigurement, physical impairment, inconvenience, grief, anxiety, humiliation, and emotional distress in the amount of $968,000.00.  She is awarded $395,000 in past non-economic damages from the time of the collision on October 8, 2021 through trial, and $720,000 in future non-economic damages. A 61-year-old female has a life expectancy of 22 years under the CACI life expectancy tables based on the National Vital Statistics Reports.  This represents approximately $283/day for the past award when the complaints were more significant, and $71/day for the future given the significant limitations on Ms. Salgado Adame's ability to use her right arm and work.  The amount of non-economic damages is reasonable and supported by the evidence, including the severity of the injuries, extent of treatment including surgeries, and the testimony regarding Plaintiffs' ongoing symptoms and impact on Plaintiffs' daily lives.

### F.  Defendant USA's Defenses – Comparative Fault and Mitigation

Defendant USA claims that Mr. Diaz Salgado's own negligence contributed to his own harm. To succeed on this claim, USA must prove (1) that Mr. Diaz Salgado was negligent and (2) that his negligence was a substantial factor in causing his own harm.  If Defendant USA proves these elements, Plaintiffs' damages are reduced by the percentage of Diaz Salgado's responsibility. The Court concludes that Diaz Salgado was comparatively negligent by driving 20 miles over the posted speed limit prior to the accident.  Diaz Salgado was comparatively negligent, because he was driving 45 miles per hour, while the posted speed limit was 25 miles per hour.  Therefore, the Court reduces Plaintiffs' damages by 10%, which constitutes Diaz Salgado's percentage of fault.

Defendant, however, has not proven that Plaintiffs failed to mitigate their damages. Mitigation requires showing that: (1) the plaintiff failed to take reasonable steps to minimize damages, and (2) damages could have been avoided by such reasonable efforts. Valle de Oro Bank

v. Gamboa, 26 Cal. App. 4th 1686, 1691 (1994).  Defendant's only argument is that Plaintiffs were treated on a lien basis. However, a tortfeasor cannot force a plaintiff to use insurance or other means to obtain medical treatment for injuries caused by the tortfeasor; that choice belongs to the plaintiff. Pebley v. Santa Clara Organics, LLC, 22 Cal. App. 5th 1266, 1273 (2018).  The collateral source rule prohibits reducing damages based on benefits available from other sources.  Hrnjak v. Graymar, Inc., 4 Cal.3d 725, 729 (1971).  Moreover, Defendant presented no evidence that different treatment modalities would have been less expensive or equally effective.  The fact that treatment was expensive does not establish failure to mitigate.  Defendant's theory of the case appears to be that Plaintiffs exaggerated or fabricated their injuries and pain.  However, the evidence does not support this theory.  Plaintiffs' complaints were consistent throughout treatment, corroborated by objective diagnostic imaging, and confirmed through surgical intervention.  It defies logic and common sense that Plaintiffs would subject themselves to years of treatment, multiple surgeries, and incur hundreds of thousands of dollars in debt for injuries they did not actually suffer.  The Court finds Plaintiffs' testimony regarding their injuries and ongoing symptoms credible.

### G.  Credibility of Defendant's Experts' Testimony

Defendant's medical experts—Dr. Rudin and Dr. Snibbe did not physically examine Plaintiffs.  Their opinions were based solely on record review, contrary to accepted standards of medical evaluation and causation determination.  Their conclusions were contradicted by Plaintiffs' treating physicians who conducted hands-on examinations and interpreted objective diagnostic imaging.  Treating physicians who actually examine and treat patients are in a superior position to opine on causation compared to experts who conduct only records review.  Under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), expert testimony must be based on sufficient facts or data and reliable principles and methods reliably applied to the facts.  Defendant's medical experts based their opinions solely on record review without examining Plaintiffs, undermining the reliability of their causation opinions.  The opinions of Plaintiffs' treating physicians are more credible and convincing than those of the United States' experts because the treating physicians actually examined and treated Plaintiffs over an extended period of time, and confirmed their injury diagnoses through surgery.

California courts recognize that treating physicians who examine patients are in a superior position to render opinions on causation compared to experts who conduct only record reviews. Kelley v. Trunk, 66 Cal. App. 4th 519, 523-524 (1998).  Defendant's experts explicitly testified they would never diagnose their own patients without examining them, yet they offered opinions about Plaintiffs without examination—a fundamental inconsistency that undermines their credibility.  Most significantly, Defendant's experts admitted: (i) they had no opinion that Plaintiffs' surgeries were unnecessary; (ii) they had no opinion that Plaintiffs were malingering or untruthful; and (iii) all symptoms began after the collision with no prior documentation of complaints.  These admissions effectively concede the core elements of Plaintiffs' case.

//
//

---

## III.    CONCLUSION

For the above reasons, the Court finds that Plaintiffs have proven by a preponderance of the evidence all elements of their negligence claim against the United States.  Additionally, the Court finds that Plaintiff Diaz Salgado was comparatively negligent and reduces Plaintiffs' damages by 10%.  Accordingly, the Court **ENTERS** Judgment in favor of Plaintiffs and against Defendant United States of America.

1.  Plaintiff Fabriciano Diaz Salgado is awarded the following damages: Economic damages in the amount of $272,478.19 and non-economic damages in the amount of $1,075,500.00 for a total of $1,347,978.19, exclusive of costs and statutory interest under 28 U.S.C. § 1961.

2.  Plaintiff Esther Salgado Adame is awarded the following damages: Economic damages in the amount of $233,190.00 and non-economic damages in the amount of $871,200.00 for a total of $1,104,390.00, exclusive of costs and statutory interest under 28 U.S.C. § 1961.

3.  Pursuant to 28 U.S.C. § 2412(d) and § 2678, Plaintiffs shall recover allowable costs, with attorney-fee limitations as set forth under the FTCA.

4.  The Court shall retain jurisdiction to determine any post-judgment matters, including the amount of Plaintiffs' costs.

5.  The foregoing constitute the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a).

6.  The Court **DIRECTS** the Clerk to enter judgment consistent with these findings.